UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 06-20861-CIV-HUCK/SIMONTON

DWIGHT JOHANNES DOWNS,

    Plaintiff,
vs.

UNITED STATES,

    Defendant.
_____/

**CORRECTED ORDER GRANTING SUMMARY JUDGMENT**

THIS MATTER is before the Court upon Defendant, the United States' Motion for Summary Judgment [D.E. #22], filed on December 7, 2006. The Court has considered the Motion and the submissions of the parties, and is duly advised in the premises.

**I.  Factual Background**

Early in the morning of April 8, 2003, Plaintiff, Dwight Johannes Downs ("Downs"), went to the beach located in the area between 70th Street and 73rd Street, Miami Beach, Miami-Dade County, Florida. Downs dove headfirst into the ocean and allegedly struck his head on a rock in the water. On impact, Downs broke his neck and was rendered a quadriplegic. This particular area of the beach had been part of a large re-nourishment project that had taken place in the 1970's as part of an effort to curb the erosion of the beach. Downs has brought suit against the United States for negligence, pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.* ("FTCA"), alleging that the United States Army Corps of Engineers (the "Corps") negligently carried out this project, leading to Downs' injuries.

1

In essence, the re-nourishment involved dredging a large quantity of fill material from offshore and adding it to the eroding portions of Miami Beach. Downs asserts that the Corps had specifically agreed with Dade County that the fill would not include rocks. Moreover, the Corps had internal policies which indicated that rocks were not to be used as part of the fill. Downs alleges that, notwithstanding the agreement, rocks were in fact distributed throughout the fill. Although the rocks were covered in sand when they were initially deposited, as the beach resettled and eroded over time, many of those rocks became exposed underwater and concentrated in the surf zone. Compl. ¶ 15.

Downs asserts that, by allowing rocks to be placed in the sandy fill, the Corps "created a hazardous trap for future users." *Id.* ¶ 16. He alleges that the Corps knew of their presence and of their danger, but failed to take action to correct the known danger. Downs also contends that the government negligently supervised the contractor, who re-nourished the beach, by permitting it to leave the rocks in the sandy fill. *Id.* ¶ 18. In addition, Downs alleges that, despite the Corps' knowledge of the danger of the rocks, it failed to warn the public of the dangers presented by the rocks. *Id.* ¶ 20. Finally, Downs states that the Corps violated the Clean Water Act, 33 U.S.C. § 1251, *et seq.*, by allowing the presence of rocks in the fill because rocks are considered pollutants within the meaning of the Act. *Id.* ¶ 22. Downs argues that those negligent acts were the direct and proximate cause of his injuries, resulting in significant damages.

In its Motion for Summary Judgment, the government asserts that it is entitled to summary judgment because (1) it is immune from suit under the Flood Control Act of 1968; (2) it is immune from suit under the independent contractor exception to the FTCA; and (3) it is immune from suit under the discretionary function exception to the FTCA. In the alternative, the government requests that the Court enter judgment on the pleadings because Plaintiff has failed to state a claim for breach of duty to warn against the United States. Because the Court determines that the independent contractor exception and the discretionary function exception to the FTCA exclude Down's claims,

the Court need not consider whether the government had a duty to warn Downs of the danger posed by the rocks.

## II.     History of the Dade Project

The U.S. Congress authorized the Dade County Beach Erosion Control and Hurricane Surge Protection Project ("Dade Project") in the Flood Control Act of 1968, Public Law 90-483, Section 203.  Stevens Decl. ¶ 7.  The primary purpose of the Dade Project was to provide beach erosion control and hurricane protection to a segment of coastline in Dade County.  According to the government, the Dade Project followed the typical process by which Congress authorizes federal shore protection projects.  First, Metropolitan Dade County sought congressional assistance to implement a project to solve erosion and/or flooding problems.  Congress authorized a study by the Corps, which examined the issues and reported back to Congress in 1965.  Congress then authorized and appropriated funds for the project.  Stevens Dep. at 2.  At the time the Dade Project was begun in the late 1970's, it was one of the first federal shore protection projects in the State of Florida and one of the largest projects constructed in the United States.  Rosen Dep. ¶ 4.

The United States entered into a Local Cooperation Agreement with Dade County, Florida.  Pl.'s Opp. to Mot. for Summ. J. ("Pl.'s Opp."), Ex. F.  That agreement set forth the respective responsibilities of the federal government and Dade County in the Dade Project.  Importantly, the agreement states that: "[t]he parties mutually agree that only suitable material will be used for project beach fill, such suitable material being defined as non-rocky, sandy material similar to that of the existing beach." *Id.* at 3.

The initial Dade Project covered approximately 10.5 miles of beach from Government Cut to Bakers Haulover Inlet.  While the Village of Bal Harbour elected to complete a renourishment project of its shoreline without the technical assistance of the Corps, the remaining geographical area was divided into five dredge and fill contracts, which were awarded by the Corps to private

3

contractors. Rosen Decl. ¶ 6. These contractors performed all of the dredge and fill work under the contracts. *Id.* The second of those contracts, Phase II, covered the geographical area from 80th Street to 63rd Street on Miami Beach, including the area where Downs dove into the ocean. *Id.* ¶¶ 7-8.

In 1978, the Corps awarded this second contract to Construction Aggregates Corporation ("CAC"). *Id.* ¶ 8. As the initial fill work began, modifications were made to the CAC contract, requiring rock removal in the entire geographical area covered by Phase II. Under the terms of the contract and its subsequent modifications, it was expected that approximately five percent of rock by volume ranging in size from two inches to ten inches in diameter would be interspersed in the final twelve inches of the material deposited on the beach. After the completion of the fill work, CAC was required to remove all such rock deposited on the beach to a depth of twelve inches below the finished surface. Although the method of removal was to be of CAC's own design, it had to insure removal of all rock larger than two inches in diameter. Pl.'s Opp., Ex. P., Modification of Contract No. DACW17-78-C-0024, Beach Erosion Control and Hurricane Protection, Phase II, Dade County, Florida.

As it became apparent that rocks were in fact present in the surf zone, CAC requested that they have permission to bury or crush the rock. Initially, the Corps responded that their contract required that CAC remove and dispose of the rock off the site in an area provided by the contractor at his expense. Eventually, however, the Corps relented and permitted CAC to bury rock on the beach.

It is Downs contention that, in violation of the cooperation agreement with Dade County, the Corps negligently filled the beach area with rocks. Furthermore, Downs alleges that the rock removal agreement with CAC was insufficient because it did not remove all of the potential rocks, including those rocks under two inches in diameter and those rocks below the top twelve inches of the fill.

4

**III.     Standard of Review**

Summary judgment is appropriate if the pleadings, depositions, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  An issue of fact is "material" if it is a legal element of the claim under applicable substantive law which might affect the outcome of the case.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986); *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997).  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Allen,* 121 F.3d at 646.  On a motion for summary judgment, the Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party, and determine whether that evidence could reasonably sustain a jury verdict.  *Celotex*, 477 U.S. at 322-23; *Allen,* 121 F.3d at 646.

While the burden on the movant is great, the opposing party has a duty to present affirmative evidence in order to defeat a properly supported motion for summary judgment.  *Anderson*, 477 U.S. at 252.  A mere "scintilla" of evidence in favor of the non-moving party, or evidence that is merely colorable or not significantly probative is not enough.  *Id.*; *see also Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996) (conclusory allegations and conjecture cannot be the basis for denying summary judgment).

**IV.     Discussion**

    **A.     Immunity Under the Flood Control Act**

The government contends that the Court does not have subject matter jurisdiction over Downs' claims because the United States is immune from suit under the Flood Control Act of 1968.  The government points to the provision in the Act which states that "[n]o liability shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."  33 U.S.C. § 702c.  Section 702c is "written broadly in the sense that it covers 'any' damage from flood

5

waters." *Fryman v. United States*, 901 F.2d 79, 80 (7th Cir. 1990). In its first examination of Section 702c immunity, the Supreme Court broadly read its plain language to include "all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control." *United States v. James*, 478 U.S. 597, 605 (1986). The Court later tempered this broad reading, stating that "[i]n determining whether § 702c immunity attaches, courts should consider the character of the waters that cause the relevant damage rather than the relation between that damage and a flood control project." *Central Green Co. v. United States*, 531 U.S. 425, 437 (2001) (noting that the broad definition of "flood or flood waters" in *James* was merely dicta).

Thus, the issue before the Court is whether the water that Downs dove into constitutes "flood waters" under Section 702c. "The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999) The Court assumes that Congress "used the words in a statute as they are commonly and ordinarily understood" and the Court reads the statute "to give full effect to each of its provisions." *Id.* (citing *United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995) (per curiam). The Court does not look at one word or term in isolation, but instead looks to the entire statutory context. *Id.* (citing *United States v. McLemore*, 28 F.3d 1160, 1162 (11th Cir. 1994) (citation omitted). The Court "will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if: (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent." *Id.* (citing *Consolidated Bank, N.A. v. Office of Comptroller of Currency*, 118 F.3d 1461, 1463-64 (11th Cir. 1997) (citations omitted).

It is evident from the plain language of the statute that the ocean waters where Downs was injured do not constitute flood waters within the meaning of Section 702c. Unlike typical flood

6

control projects, the Dade Project did not involve the placement or arrest of water flow, but merely the filling of existing water with sand. *Cf. Fryman*, 901 F.2d at 80 (finding that artificially-created lake constituted flood waters). The government has provided no case where the ocean was considered to have been "flood waters." A typical definition of a "flood" is "a rising and overflowing of a body of water onto land not usually under water." Webster's Third New Int'l Dictionary 873 (1981). The ocean waters into which Downs dove are not such flood waters. Downs has not suggested that the tides had risen to cover lands that were not typically covered. To the contrary, the Dade Project served to fill in the beach area, meaning that less land was actually covered in water. *See* Pl.'s Opp., Ex. I (plan drawings illustrating that the dredged materials were placed in areas already covered with ocean water). The mere fact that a flood control project was taking place in the area where Downs was injured cannot alter the plain meaning of flood waters to include ocean waters that were neither rising nor overflowing onto land not usually under water. Accordingly, the government is not entitled to immunity under Section 702c of the Flood Control Act of 1968.

### B. Immunity Under the Federal Tort Claims Act

The government next asserts that it is immune from suit pursuant to exceptions to the FTCA. The United States is immune from suit unless it consents to be sued. *United States v. Sherwood*, 312 U.S. 584, 586 (1941). Congress, through the FTCA, has waived the sovereign immunity of the United States by giving district court jurisdiction over "civil actions against the United States for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Congress has, however, qualified that waiver of immunity with several exceptions. In this case, the Government contends that two of those exceptions apply: the discretionary function

exception and the independent contractor exception.

### 1.     Independent Contractor Exception

The independent contractor exception to the FTCA, 28 U.S.C. § 2671, provides that the United States may not be held derivatively or vicariously liable for the acts of independent contractors. *Phillips v. United States*, 956 F.2d 1071, 1077 (11th Cir. 1992); *see also Dickerson, Inc. v. United States*, 875 F.2d 1577, 1582 (11th Cir. 1989). "The alleged tortfeasor's status as an 'employee of the government' is the *sine qua non* of liability under the FTCA." *Means v. United States*, 176 F.3d 1376, 1378 (11th Cir. 1999). As noted above, the Corps contracted with CAC, an independent contractor, to perform both the original fill work and the rock removal. To the extent such work was in fact delegated to CAC, Downs does not contest the applicability of the independent contractor exception. Instead, Downs merely contends that (1) the contract with CAC did not adequately address the rock problem, and (2) the Corps failed to properly supervise CAC. Those issues will be addressed in the Court's examination of the discretionary function exception. Based on the independent contractor exception, to the extent that liability for Downs' injuries rests with CAC or another contractor, the government is immune from suit.

### 2.     Discretionary Function Exception

The discretionary function exception precludes government liability for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). There is a two-part test to determine whether challenged conduct by a government employee falls within the discretionary function exception. *Powers v. United States*, 996 F.2d 1121, 1124 (11th Cir. 1993). First, the Court must determine whether the challenged conduct involves an element of choice. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The exception "will not apply when a federal statute, regulation, or policy specifically

prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.* Second, if the challenged conduct involves discretion, we determine whether that discretion is "of the kind that the discretionary function exception was designed to shield." *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984). In determining the applicability of the discretionary function exception, "it is the nature of the conduct, rather than the status of the actor," that should be examined. *Id.* at 813. Once it has been determined that the discretionary function exception applies, the negligence of the government is irrelevant. *See Dickerson*, 875 F.2d at 1581 (noting that the exception applies even to those actions constituting an abuse of discretion).

### a. Whether the Challenged Action Involved an Element of Choice

First, the Court must decide whether the challenged action was discretionary. Under the first part of the test, the "relevant inquiry is whether the controlling statute or regulation mandates that a government agent perform his or her function in a specific manner." *Powers*, 996 F.2d at 1125. The discretionary function exception will apply unless Downs can point to a statute or regulation that "specifically prescribes a course of action embodying a fixed or readily ascertainable standard." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997) (quoting *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993)). Downs claims that (1) the Corps was contractually obligated by the local cooperation agreement to ensure that only non-rocky material was placed in the beach fill, (2) the Corps violated the Clean Water Act by discharging rocks into the fill, (3) the Corps failed to observe the terms of the State of Florida's permit to Dade County, and (4) the Corps had adopted policies that prevented the use of rocks in the fill.

### 1.      Local Cooperation Agreement

It is Downs' primary contention that the local cooperation agreement between the Corps and Dade County prevents the government from availing itself of the discretionary function exception. Before examining the specific terms of the local cooperation agreement, the Court must determine whether a contract can impose the same mandatory actions as a statute or regulation for the purposes of the discretionary function exception. Several courts have recognized that the government's voluntarily assumed contractual obligations can impose nondiscretionary duties on government employees. *See, e.g., Bell v. United States*, 127 F.3d 1226, 1230 (10th Cir. 1997) (finding that contract specifications left no discretion); *Kiehn v. United States*, 984 F.2d 1100, 1106 (10th Cir. 1993) (mandatory emergency assistance required by contract and National Park Service Guidelines); *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991) ("discretion may be removed if the government incorporates specific safety standards in a contract which imposes duties on the government's agent." (internal quotation omitted)); *Feyers v. United States*, 749 F.2d 1222, 1227 n. 7 (6th Cir. 1984) (considering whether contract required specific safety measures). In a case arising out of southern Florida, the Federal Circuit found that FEMA's decision to permit a contractor to clean up a site in a manner inconsistent with the terms of a contract did not constitute a discretionary function. *Dureiko v. United States*, 209 F.3d 1345, 1353 (Fed. Cir. 2000) ("For purposes of the discretionary function exception of the Stafford Act, we hold that a contract is indistinguishable from a federal statute, regulation, or policy that specifically prescribes a course of action for an employee to follow, since 'the employee has no rightful option but to adhere to [its] directive[s].'") (citing *Berkovitz*, 486 U.S. at 536).[1]

Although the Eleventh Circuit has not squarely addressed the issue, it has favorably suggested

---

[1] Although the *Dureiko* court considered the discretionary function exception to the Stafford Act instead of the FTCA, the analysis is identical.

that contractual obligations may impose mandatory duties upon an agency or its employees. In *Andrews v. United States*, two naval stations contracted with a waste management company to dispose of residential and industrial waste at the bases. 121 F.3d 1430, 1439 (11th. Cir. 1997). After the waste company disposed of the waste at a landfill that was surrounded by single family residences, the landfill contaminated the area's land and water. The district court concluded that the contracts at issue did impose an implicit mandatory duty upon the Navy to ensure that the unauthorized materials were not improperly placed.[2] *Id.* (citing *Woodman v. United States*, 764 F. Supp. 1455, 1463 (M.D. Fla. 1991)). The Eleventh Circuit reversed the decision because the plaintiffs failed to address the essential element of causation in their claim. The Eleventh Circuit did, however, approve of the district court's finding that, pursuant to the waste management contracts, the Navy had mandatory duties, rendering the discretionary function exception inapplicable. *Id.* at 1441. The government contends that the *Andrews* court only reached the determination that the contract was a mandatory directive because Naval policy regulations were incorporated into the contract. While it is true that the contract incorporated language from a policy manual by reference, there is no indication in the court's opinion that this fact was a dispositive feature of its finding that the contract imposed mandatory duties upon the government. Moreover, the government has pointed to no case where a court has treated a contract differently than if it had been a statute or regulation. Accordingly, the Court finds that, for the purpose of the discretionary function exception, a contract that prescribes mandatory action is indistinguishable from a federal statute, regulation or policy.

Having determined that a contract may prescribe a specific course of action, the Court must now decide whether the local cooperation agreement with Dade County does in fact do so. The

---

[2] Indeed, the district court went on to note that, although the contracts did not expressly set forth an obligation to segregate the waste, "common sense dictate[d] that if parties to a contract agree that only certain materials may be disposed of in dumpsters, the party disposing of the materials has the obligation to ensure that it complies with the terms of the contract." *Woodman*, 764 F. Supp. at 1463.

government contends that (1) the agreement does not rise to the level of a contract, and (2) the agreement does not contain sufficient mandatory directive language.

A contract is an "agreement between two or more parties creating obligations that are enforceable or otherwise recognizable at law." Black's Law Dictionary 341 (8th ed. 1999). The 1972 local cooperation agreement is quite clearly a contract. The agreement itself states that:

> [t]he Sponsor [Dade County] agrees that if the Government shall commence construction of the Beach Erosion Control and Hurricane Protection, Dade County, Florida, substantially in accordance with Federal legislation authorizing such Project, (Public Law 90-483, Section 203), the Sponsor shall, in consideration of the Government commencing construction of such Project, fulfill the requirements of non-Federal Cooperation specified in such legislation." Pl.'s Opp., Ex. F. at 1.

Both the Corps and Dade County voluntarily, and in consideration for the other's actions, entered into the local cooperation agreement. Indeed, the government even acknowledges that, while local cooperation agreements are not contracts governed by federal acquisition regulations, their enforceability has been recognized by Congress. Def.'s Supplemental Brief in Support of Mot. for Summ. J. at 4 (citing Water Resources Development Act of 1986, Pub. L. No. 99-662, § 912) (permitting Secretary of the Army to seek enforcement from local sponsors). As an enforceable agreement between the Corps and Dade County, the local cooperation agreement was therefore a contract capable of mandating specific action, as contemplated in the discretionary function exception.

The final issue for the Court is whether the local cooperation agreement did in fact contain mandatory language. "Whether a policy establishes a mandatory requirement so as to deprive government employees of discretion depends on the terms of the particular policy at issue." *Autery*, 992 F.2d at 1529. In order to deprive the government of the protection of the discretionary function exception, the local cooperation agreement must "specifically prescribe[ ] a course of action . . . embodying a fixed or readily ascertainable standard." *Id.* (internal quotations omitted). Again, the

local cooperation agreement states that the only suitable material for the beach fill was "non-rocky, sandy material similar to that of the existing beach." On the one hand, this appears to be straightforward language requiring that the government only use non-rocky materials. To the extent the government did in fact permit the inclusion of rocks within the fill, it ran afoul of this mandatory language. On the other hand, the contract does not specifically prescribe a method for ensuring the absence of rocks in the fill.

The government first contends that, even if the local cooperation agreement mandated specific action, the Corps exercised its recognized policy discretion by delegating the responsibility over the project to CAC. Downs disagrees, alleging that the Corps did not adequately delegate authority to CAC. According to Downs, the contract with CAC delegating only a limited amount of rock removal authority, meaning the Corps retained the responsibility it undertook in the local cooperation agreement to ensure the absence of all rocks from the fill. It is well-settled, and Downs does not disagree, that the decision by the Corps to use contractors to execute the Dade Project falls within the discretionary function exception to the FTCA. *See Andrews*, 121 F.3d at 1439 ("The law is clear that the government may delegate its safety responsibilities to independent contractors in the absence of federal laws or policies restricting it from doing so"). Downs has pointed to no law that limits the ability of the Corps to delegate the beach erosion tasks involved in the Dade Project to an independent contractor. *Cf. Dickerson, Inc.*, 875 F.2d at 1581 ("cradle to grave" policy did not permit government to delegate responsibility for certain waste materials). In this case, the Corps delegated its rock removal authority to CAC. CAC was required to remove all such rock deposited on the beach to a depth of twelve inches from the finished surface. Although the method of removal was to be of CAC's own design, it had to insure removal of all rock larger than two inches in diameter. Pl.'s Opp., Ex. P. *See also* Rosen Dep. at 65 ("Any rock deposited on the beach larger than two-inch in diameter will be removed from the site of work at the expense of the contractor

13

approved by the contracting officer"). As recognized in the independent contractor exception to the FTCA, the federal government may not be held liable for the negligence of CAC or any of the other contractors in the fulfillment of their contractual obligations. Likewise, the nature and extent to which the Corps engaged in supervision over CAC's execution of the Dade Project is covered by the discretionary function exception. *See Varig Airlines*, 467 U.S. at 820; *see also Johns v. Pettibone Corp.*, 843 F.2d 464 (11th Cir. 1988). Although it is clear from the evidence submitted by Downs that the Corps maintained some supervisory role in the Dade Project, Downs has not suggested that the Corps was required to maintain supervision over CAC's execution of the project. Thus, all Corps decisions regarding whether and how to supervise the project were within the discretion of the Corps.

Nevertheless, accepting that the Corps adequately delegated certain rock removal authority to CAC in the Phase II contract, it appears that the Corps may have retained *some* responsibility for ensuring the absence of rocks in the fill. Since CAC was only required to remove the rocks in the top twelve inches and rocks greater than two inches in diameter, small rocks could still wind up in the bottom of the fill. By failing to ensure the absence of those rocks, according to Downs, the Corps violated the explicit terms of the local cooperation agreement.

The government further contends that when read in the context of the entire Dade Project, the local cooperation agreement cannot be understood to require the absence of *all* rocks in the fill. Indeed, in the Corps' 1965 study report that recommended the beach erosion project to Congress, the Corps stated that "all material dredged from Biscayne Bay, including rock, sand, and silt, would be used." Mot. For Summ. J., Ex. 6, Army Corps Report on a Cooperative Beach Erosion Control Study at 49. In the Flood Control Act, Congress authorized the Dade Project, "substantially in accordance with the recommendations of the Chief of Engineers." Pub. L. No. 90-483. Finally, the local cooperation agreement requires that the Corps and Dade County fulfill their obligations as specified in that legislation. Thus, according to the government, the local cooperation agreement did

in fact contemplate the inclusion of rocks in the fill--or, at the very least, the language creates an ambiguity in the agreement.

Several other aspects of the Dade Project lend support to the government's position as well. First, it is important to note that the Corps was attempting to place over 13 million cubic yards of fill along the shoreline of Dade County from the borrow area off of Miami Beach. According to Downs' own expert witness, even if the most sophisticated methods of rock removal had been utilized, it would have been impossible to eliminate the presence of all rocks. *See* Hendry Dep. at 213-16 (stating that rocks three to four inches in diameter might make it through the dredging system and that it would be impossible to totally eliminate rocks from the fill). Given that the local cooperation agreement does not prescribe a specific course of action, it seems unreasonable to interpret it as mandating an impossible goal. *See Regions Bank v. Provident Bank, Inc.*, 345 F.3d 1267, 1276 (11th Cir. 2003) (recognizing that the Supreme Court has counseled against construing a statute in a way that would lead to an absurd result); *see also United States v. Granderson,* 511 U.S. 39, 47 n. 5 (1994) (refusing to apply a "plain meaning" interpretation of a sentencing proviso when such an interpretation "leads to an absurd result"). If the Court were to read the local cooperation agreement to require that the Corps ensure the absence of all rocks from the fill, an impossible goal, it would be an absurd interpretation.

In addition, once it was apparent that rocks had been included in the fill, the Corps and Dade County together sought to remedy the problem. *See* Pl.'s Opp., Ex. T., CAC Project Superintendent Al Josephson's Field Notes (Feb. 13, 1980). Project Superintendent Josephson recounts the circumstances: "The Corps met with Dade County yesterday. They want the rock off the beach, but need a 'week or two' to line the trucks up. If they don't have the trucks by then, the Corps will ask us to bury the rock." *Id.* At this point, the County was working in tandem with the Corps to fix the problem with the presence of rocks and did not allege any failure on the part of the Corps to observe

15

the terms of the local cooperation agreement. The Court thus finds it significant that Dade County, the party to the agreement, did not interpret the local cooperation agreement to mandate the absence of all rocks.

With these facts in mind, the local cooperation agreement cannot be read in a way that would require the Corps to eliminate any and all rocks. The local cooperation agreement was created in order to aid in filling the beach area and prevent further erosion. It cannot be contemplated that the agreement would then require an execution that was impossible. Instead, the Corps, in cooperation with Dade County, determined that the rock problem would be adequately addressed by the terms of the contract with CAC. Moreover, the one-line prohibition of rocky materials included in the local cooperation agreement cannot alone serve to mandate action when it is contradicted by numerous other documents in a complex governmental project. Viewing the language of the local cooperation agreement in that context, it does not prescribe a fixed and ascertainable standard by stating that the beach fill would contain only non-rocky material. Thus, the local cooperation agreement did not deprive the government of discretion in dealing with the rock problem.

### 2. Clean Water Act

Downs also suggests that, by placing rocks in the beach fill, the Corps violated the Clean Water Act, 33 U.S.C. § 1251, *et seq.* The Clean Water Act prohibits the discharge of pollutants, including rocks, into navigable waters. § 1362(6). However, under § 1344(r), "[t]he discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress . . . is not prohibited by or otherwise subject to regulation under this section" if the information on the effects of the discharge are included in an environmental impact statement submitted to Congress. Because the Corps did submit an environmental impact statement on the effects of the discharge to Congress, it is entitled to immunity under § 1344(r). *See* United States Army Corps of Engineers, SAJ Planning Division, Dade County Beach Erosion Control Project

Environmental Documentation, Dade County, Florida, http://planning.saj.usace.army.mil/envdocs_A-D/Dade_Co/DadeCountyBeachErosionControlProjectED/index.html (last visited March 9, 2007) (noting the submission of the final environmental impact statement for the Dade Project before Congress in April, 1975). Therefore, the Clean Water Act does not prevent the government from availing themselves of the discretionary function exception.

### 3. Permit for the State of Florida

Downs alleges that the State of Florida's permit for the Dade Project mandated that the Corps not use rocks in the fill. Downs asserts that it was Corps policy to comply with all local permit requirements for the project. *See* Martin Dep. at 130. Nevertheless, the State permit cannot be read to require mandatory action on the part of the government. First, the State permit was issued to Miami-Dade County and the United States was not a party to it. Second, despite Dr. Martin's testimony that it was Corps policy to follow permit guidelines, Downs has submitted no such policy suggesting that it was a requirement in the Dade Project. Any Corps decision to follow or not follow Dade County's permit guidelines was a matter of policy and, thus, a discretionary choice. Finally, even if the federal government were deemed to be bound by the permit, it contains no mention of rocks whatsoever. This can hardly be read to prohibit the inclusion of rocks in the fill. Accordingly, the State permit does not mandate specific action.

### 4. General Design Memorandum and Corps Policy

Finally, Downs alleges that the discretionary function exception cannot apply because the Corps had policies against the use of rocks in the beach fill. Specifically, Downs points to the General Design Memorandum of 1975 ("GDM") and its subsequent Addendum from 1984. Downs highlights the fact that the GDM makes no reference whatsoever to rocks or their allowance. *See* Rosen Dep. at 62-63. This is not entirely true, however. The GDM notes that during the preauthorization period,

17

"it was proposed to use all the material dredge from Biscayne Bay, including rock, sand, and silt. The rocky material would be used as a core for the beach fill, with a layer of sand from the beach at least 2 feet thick as cover." GDM at 20.  Nevertheless, Downs contends that the GDM indicates that no rocks were to be included in the fill.  As evidence of the failure to observe the GDM's no-rock policy, Downs directs the Court to an Addendum to the GDM.  After recognizing the improper presence of rocks, the Corps added the Addendum stating, "[i]n order to bring the [Dade Project] to the standards provided in the authorizing document . . . rocks must be removed from the surf zone along most of the shore south of Bakers Haulover."  Pl. Opp., Ex. H., GDM Addendum at 25-26.  The Addendum set forth a plan by which the Corps would approach removing the rocks from that point. It in no way recognized a failure of the Corps to observe the language of the original GDM. Regardless, there is no language whatsoever in the GDM that prohibits the Corps from placing rocks in the fill.  Accordingly, the GDM does not constitute mandatory language.

The Court has thus determined that it was not subject to any mandatory action with respect to the presence of rocks in the beach fill.  Because the Corps was not required to abide by the terms of the Clean Water Act, the statute did not mandate action by the government.  Neither the permit from the State of Florida nor the GDM contain language that the Corps failed to properly observe. The local cooperation agreement, although it contains language that appears mandatory at first blush, cannot be read to have deprived the Corps of meaningful discretion in addressing the rock problem.

### b. Whether the Challenged Action Was Policy-Oriented

Accordingly, having decided that no mandatory statute, regulation, contract or policy controlled the decision of how to address the presence of rocks in the fill, the Court must determine whether the challenged actions were the type of conduct "that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 321.  The exception does not cover all discretionary acts, but only those governmental actions and decision based on considerations of public policy. *Id*.

18

Courts have consistently recognized that the policy decisions in beach erosion projects warrant protection under the discretionary function exception. *See, e.g.*, *Valizburd v. United States*, 90 F. Supp. 2d 210, 214 (E.D.N.Y. 2000); *see also Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415, 1422 (9th Cir. 1997) (applying discretionary function exception to Corps' construction of a breakwater in a harbor). Indeed, the decisions made by the Corps in this case appear to fall neatly within the type of policy choices contemplated by Congress in the creation of the discretionary function exception to the FTCA. As mentioned above, decisions on whether to delegate authority to independent contractors and whether and to what extent to supervise their actions are well-recognized policy decisions that government actors must make. Likewise, the Corps' decision to alter the project plan upon the realization that rocks were more of a problem than initially contemplated is exactly the type of choice that government officials must be able to make. Downs focuses a great deal on the negligence of the government in the undertaking of the Dade Project. The Court cannot reach that question, however. The Court's determination that the discretionary function exception immunizes the government from suit is neither an endorsement nor a critique of the actions or decisions by the Corps. The purpose of the discretionary function exception is to prevent that type of judicial second-guessing over the policy decisions that rest more soundly with the Corps in this case. Accordingly, the government has satisfied the second prong of the discretionary function test. Thus, with both elements of the test fulfilled, it is the determination of the Court that the government is immune from suit under the discretionary function exception to the FTCA.

**V.     Conclusion**

For the foregoing reasons, it is hereby

ORDERED that Defendant's Motion for Summary Judgment is GRANTED.

DONE and ORDERED in Chambers at Miami, Florida this 19th day of March, 2007.

_____
Paul C. Huck
United States District Judge

Copies furnished to:
All Counsel of Record