UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-20861-CIV-HUCK/O'SULLIVAN

DWIGHT JOHANNES DOWNS,

    Plaintiff,
v.

UNITED STATES,

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court for a ruling on the issues presented during an evidentiary hearing held on June 28, 2010 and July 16, 2010. The Court held the evidentiary hearing for the parties to present extrinsic evidence relevant to construing the ambiguous contract term "non-rocky, sandy material similar to that of the existing beach." This term appears in an agreement between the U.S. Army Corps of Engineers and Dade County relating to a Miami Beach renourishment project. At issue is whether the term prescribes a discretionary standard or a mandatory directive. The answer determines whether the United States is immune, under the discretionary function exception to the Federal Tort Claims Act, from suit arising out of its alleged failure to ensure that the material used in the beach renourishment project complied with the term. For the reasons below, the Court finds that the disputed term prescribes a mandatory directive and that Downs can proceed with this lawsuit against the United States.

**I.**    **Background and Procedural History**[1]

Dwight Johannes Downs broke his neck and was rendered a quadriplegic in April 2003 when he dove into the ocean off of Miami Beach and allegedly struck his head on a rock. The area of the beach where Downs was injured was part of a large beach renourishment project in the 1970s and 1980s. The renourishment project involved dredging a large quantity of fill material from offshore and adding it to eroding portions of Miami Beach. The project was

---

[1] For more background about this case, see the previous opinions by the Eleventh Circuit and this Court. *Downs v. U.S. Army Corps of Eng'rs*, 333 F. App'x 403 (11th Cir. 2009); *Downs v. United States*, No. 06-20861, 2007 WL 842136 (S.D. Fla. Mar. 20, 2007).

executed by the U.S. Army Corps of Engineers through a local cooperation agreement entered into with Dade County on October 12, 1972.  Of particular significance, in the local cooperation agreement, "[t]he parties mutually agree[d] that only suitable material will be used for project beach fill, such suitable material being defined as *non-rocky, sandy material similar to that of the existing beach*."  Downs alleges that, despite this agreement, rocks the size of baseballs, coconuts, and basketballs were included in the fill material.

In 2006, Downs brought this suit against the federal government for negligence under the Federal Tort Claims Act.  Downs alleged that the U.S. Army Corps of Engineers negligently undertook its duty to ensure the absence of rocks in the material used in the renourishment project, and negligently failed to warn about known potential dangers that resulted from its actions, thereby proximately causing his injuries.

The government moved for summary judgment, arguing, in relevant part, that the government was immune from suit under the discretionary function exception to the Federal Tort Claims Act.[2]  Specifically, the government argued that the local cooperation agreement did not contain sufficient mandatory language to deprive the Corps of discretion in determining the nature of material used for the fill material.  The Court granted the government's motion for

---

[2] The discretionary function exception precludes government liability for any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  There is a two-part test to determine whether challenged conduct by a government employee falls within the discretionary function exception. *Powers v. United States*, 996 F.2d 1121, 1124 (11th Cir. 1993).  First, the Court must determine whether the challenged conduct was discretionary in nature, i.e., whether the action involves an element of choice. *Berkovitz v. United States*, 486 U.S. 531, 536 (1988).  The exception "will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.  In this event, the employee has no rightful option but to adhere to the directive." *Id.*; *see also Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993) ("Only if a federal statute, regulation, or policy specifically prescribes a course of action, embodying a 'fixed or readily ascertainable standard,' will a government employee's conduct not fall within the discretionary function exception." (internal quotations omitted)).  Second, if the challenged conduct involves the exercise of discretion, the Court must determine whether the judgment is grounded in considerations of public policy. *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991).  If it has been determined that the discretionary function exception applies, the negligence of the government is irrelevant. *See Dickerson*, 875 F.2d at 1581 (noting that the exception applies even to those actions constituting an abuse of discretion).  The burden is on the plaintiff to prove that the discretionary function exception, once raised by the government, does not apply. *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002).

summary judgment. In particular, the Court found that the meaning of the contract term "non-rocky, sandy material similar to that of the existing beach" was ambiguous, and thus did not prescribe a fixed or readily ascertainable standard. Accordingly, the Court found that the local cooperation agreement did not deprive the government of discretion in dealing with rocks in the fill material.

On appeal, the Eleventh Circuit also found that the disputed term was ambiguous, but concluded that the ambiguity did not obviate the Corps' duty to comply with the contract. *See Downs v. U.S. Army Corps of Eng'rs*, 333 F. App'x 403, 410-13 (11th Cir. 2009) ("A contractual duty does not cease to exist because the terms of that duty are ambiguous and require elucidation by parol evidence."). Instead, the Eleventh Circuit indicated that the term should be construed using extrinsic evidence. As the Eleventh Circuit noted, only after the term has been construed can it be determined whether the term was sufficiently specific, embodying a fixed or readily ascertainable standard, to subject the government to suit.[3] The Eleventh Circuit remanded the case to this Court to use extrinsic evidence to construe the term. The Eleventh Circuit also directed the Court to consider all words in the term, including "similar to that of the existing beach," noting that it may provide a measurable standard for the Corps' duty. *Id.* at 412.

The Court held an evidentiary hearing on June 28, 2010 and July 16, 2010 on the narrow issue of the meaning of the clause "non-rocky, sandy material similar to that of the existing beach." The parties submitted documentary evidence and called witnesses to testify. During the hearing on June 28, 2010, Downs called six lay witnesses (and introduced the deposition testimony of a seventh lay witness) who were long-time Miami residents and frequented Miami Beach before or during the 1970s. These witnesses testified from their own personal experience that before the beach renourishment project, there were no natural rocks on the beach the size of baseballs, coconuts, or basketballs. In fact, the witnesses either did not recall seeing any natural rocks, or only recalled seeing small rocks roughly the size of a young child's hand. The government called three witnesses: (1) Diane Collins, the Acting Division Chief for the Clerk of the Board of County Commissioners for Miami-Dade County; (2) Richard Bonner, a civil

---

[3] For example, the Eleventh Circuit stated that "if on remand parol evidence shows that the parties agreed that the term 'non-rocky, sandy material similar to that of the existing beach' means that the fill material was to be no more than 5% rock by volume with no individual rocks larger than 4 inches in diameter, then the standard is sufficiently specific to establish a mandatory duty." *Downs*, 333 F. App'x at 413 n.6.

3

engineer who worked with the U.S. Army Corps of Engineers from 1969 until 2007; and (3) Douglas Rosen, a geologist who began working with the Corps in 1978. During Rosen's testimony on June 28, 2010, he revealed, apparently for the first time, that he and his predecessor took samples of the beach before the renourishment project, and that there may be field notes reflecting that information. The hearing was adjourned so Rosen's field notes could be located. The Court continued the evidentiary hearing on July 16, 2010, during which Rosen continued to testify, and the government introduced into evidence Rosen's field notes and data from beach samples taken between 1977 and 1979.

## II.     Analysis

### A.     Findings of Fact

Having considered the testimony and evidence from the evidentiary hearing, and as explained below, the Court finds that the disputed contract term means a material consisting almost exclusively of sand, with only a small percentage of interspersed gravel no larger than one or two inches in diameter.

The Court begins with the language of the disputed term "non-rocky, sandy material similar to that of the existing beach." The Court notes that the words "non-rocky" and "sandy" are both adjectives that modify the noun "material." Thus, a natural reading indicates that the fill material should not have much, if any, rock, and that it should consist primarily of sand. The Court further notes that under a natural reading of the term, the phrase "similar to that of the existing beach" modifies or gives meaning to the phrase "non-rocky, sandy material." Indeed, the Eleventh Circuit directed the Court to consider the phrase "similar to that of the existing beach." Therefore, the state of the existing beach (including the existence or absence of rocks) should help to clarify the meaning of the phrase "non-rocky, sandy material."

The Court now turns to the extrinsic evidence submitted by the parties. Neither party called a witness from Dade County or from the U.S. Army Corps of Engineers who was involved in the negotiation or signing of the local cooperation agreement who could directly address the intent of the parties to the agreement. Therefore, the Court must rely on circumstantial evidence to determine the meaning of the disputed term. The Court begins with the word "sandy." The Court finds particularly helpful a 1984 soil classification chart from the Corps of Engineers Shore Protection Manual that was introduced during Douglas Rosen's testimony on July 16. (Defendant's Exhibit 65.) The chart shows classifications of different types of soil material in

4

ascending order—clay, silt, sand, fine gravel, coarse gravel, cobble, and boulder—based on grain size in millimeters. The chart compares the Unified Soils Classification, which was the soil classification system used by the Corps of Engineers, with another soil classification system called the Wentworth Classification. Under the Corps' soil classification system, the grain size of sand ranges from 0.074 millimeters (fine sand) to 4.76 millimeters (coarse sand).[4] Rosen testified that a material is considered to be a "sandy material" if more than fifty percent of the material is sand. (Doc. #154, Hr'g Tr. 31, July 16, 2010.) Therefore, the Court finds that the local cooperation agreement, by requiring "sandy material," required that at least fifty percent of the fill material have a grain size between 0.074 and 4.76 millimeters.

To further refine the meaning of the disputed term, the Court now turns to the phrase "similar to that of the existing beach." In addition to Downs' lay witnesses' testimony, the Court again finds Douglas Rosen's testimony and evidence introduced during his testimony to be particularly helpful. Between 1977 and 1979, Rosen and his predecessor at the Corps took samples of the native beach. The purpose of the sampling was to compare the native beach with material in the offshore borrow area. During the July 16 hearing, the government introduced into evidence Rosen's field notes showing the location of samples. (Defendant's Exhibit 63.) The field notes show that samples were taken at regular intervals along Miami Beach between 79th Street to the north and Government Cut at the southern tip of Miami Beach. At each location, samples were taken at the mean low water line (i.e., zero elevation) and then, moving east into the water, at regular elevation intervals of negative 5, 10, 15, 20, and 25 feet.[5] At most locations,

---

[4] Under the Wentworth Classification, the grain size of sand ranges from 0.062 millimeters to 2.0 millimeters. However, the Court will use the Corps' classification system because it is more likely that the Corps and Dade County had it in mind when they agreed to the terms of the local cooperation agreement. Moreover, the exact size of the sand is not particularly relevant to the Court's analysis.

[5] The field notes indicate that at some locations along Miami Beach, only rock, and no sand, was found at depths of 20 or 25 feet (and, on one occasion, 15 feet) below the mean low water line. The Court does not find the existence of rock at these locations to be significant. During Rosen's testimony on June 28, he defined the "beach" as extending from the dry portion of sand above the water out into the water until "the beach sand hits the rock platform and there's no more sand." (Doc. #151, Hr'g Tr. 110-11, June 28, 2010 (discussing Defendant's Exhibit 22-A).) The rock encountered at depths of 15, 20, and 25 feet appears to be part of the "rock platform" and not part of the beach. (*See* Doc. #154, Hr'g Tr. 17, July 16, 2010 ("These samples and field notes show that the beach pinched out and encountered the rock platform offshore at minus 20 to minus 25 feet below mean low water.").)

another one or two samples were taken at positive elevations to the west of the mean low water line.  The government also introduced into evidence a Supplemental Appendix to Addendum 2 of the Corp's General Design Memorandum for the renourishment project.  (Defendant's Exhibit 64.)  This appendix, created in 1984, contains geotechnical data about the renourishment project, including gradation curves based on the results of lab analyses of the samples taken from the native beach.  (*See, e.g.*, Defendant's Exhibit 64, Corps 00213-Corps 00290.)  The gradation curves show the range of the grain sizes in each sample, as well as the grain size distribution.  Of particular significance, Rosen testified that the coarsest (i.e., largest) material contained in any of the samples was three-quarter inch gravel.  (*See* Defendant's Exhibit 64, Corps 00228.)  And even in that sample (which was taken at a depth of 20 feet below the mean low water line), only seven percent of the sample was coarser than sand.  Most, if not all, of the other samples contained an even smaller percentage of material coarser than sand.  Taken together, this evidence shows that the vast majority of the material on the existing beach was sand, and a very small percentage (seven percent or less) of the material was gravel with a maximum size of approximately three-quarters of an inch.

This description of the existing beach is corroborated by the testimony of the lay witnesses called by Downs.  These witnesses, who frequented Miami Beach before the renourishment project, testified that they either did not recall seeing any natural rocks on the beach, or recalled seeing only an occasional small rock.  For example, one witness recalled seeing coral and limestone rocks approximately three centimeters (approximately 1.18 inches) in size, or the size of her hand as a young child.  (Doc. #153, Hr'g Tr. 44-47, June 28, 2010.)  None of the witnesses recalled seeing any natural rocks the size of baseballs, coconuts, or basketballs.  Nor did the government introduce any *relevant* evidence to the contrary.  The government introduced photographs of Miami Beach from before the renourishment project that showed man-made structures such as seawalls, groins, and jetties that were constructed out of materials such as wood, rock, and concrete.  (*See* Defendant's Exhibits 1-19.)  The Court, however, does not find that these man-made structures are relevant to what the parties meant when they agreed on the term "non-rocky, sandy material similar to that of the existing beach."  By agreeing to use "sandy material" to refurbish the beach, the parties were not contemplating materials such as concrete and wood used in building seawalls, groins, jetties, or other man-made additions on or

near the beach. It is obvious that the parties did not have in mind the existing man-made structures when they entered into the agreement.

Finally, the Court finds it relevant that the first dredging contract the Corps entered into for the renourishment project required that the fill material be no larger than two inches in diameter. The Corps entered into the contract for Phase I of the renourishment project in December 1976. The Phase I contract, in a section titled "Beach Fill," required:

> If rock is encountered in the borrow area, the location of the dredging shall be immediately changed by the Contractor and any rock deposited on the beach larger than 2 inches in diameter shall be removed from the site of the work and disposed of in areas provided by and at the expense of the Contractor and approved by the Contracting Officer.

(Plaintiff's Ex. 13 at 5, § 2A, ¶ 3.1.)[6] This suggests that the Corps may have understood the local cooperation agreement to prohibit any fill material larger than two inches in diameter.

The government contends that the local cooperation agreement could not have prohibited rocks the size of baseballs or coconuts because dredging and rock removal technology at that time was not advanced enough to remove rocks of that size from the borrowed fill material. To the extent borrow areas without rock could be located, this contention is irrelevant. Moreover, rocks could be removed through processes other than dredging, such as passing the material through grating screens or crushing any rock. In fact, Rosen testified about the use of a "grizzly" grating machine, with parallel bars that could screen the material and remove rocks larger than one inch in diameter. (Doc. #151, Hr'g Tr. 132, June 28, 2010); *see also Downs*, 333 F. App'x at 412 ("Without weighing the evidence, we also note that the record reflects that rocks could have been removed from the fill material by means other than through the dredging process, such

---

[6] The government argues that the Phase I Contract is irrelevant because the Corps entered into it in 1976—four years after it entered into the local cooperation agreement. The Court disagrees. The Phase I Contract is relevant because the Corps' actions after entering into the local cooperation agreement can help the Court discern the parties' own interpretation of the agreement. *See Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958) ("[T]he actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract."); *see also* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 32:14 (4th ed. 1999) ("Given that the purpose of judicial interpretation is to ascertain the parties' intentions, the parties' own practical interpretation of the contract—how they actually acted, thereby giving meaning to their contract during the course of performing it—can be an important aid to the court.").

7

as by passing the material through screens, grating the sand, or crushing the rock, and that on summary judgment the district court must view all permissible evidence in the light most favorable to the nonmoving party."). Finally, the government's contention is belied by the requirement in the Phase I contract that any rock deposited on the beach larger than two inches in diameter be removed from the beach by its contractor.

For the foregoing reasons, the Court construes that term "non-rocky, sandy material similar to that of the existing beach" as material consisting almost exclusively of sand (as defined by the Corps' soil classification system), with only a small percentage of interspersed gravel no larger than one or two inches in diameter.

### B.  Conclusions of Law

Having construed the disputed subject term, the Court must determine whether the local cooperation agreement, as construed, "specifically prescribes a course of action embodying a fixed or readily ascertainable standard." *Hughes v. United States*, 110 F.3d 765, 768 (11th Cir. 1997) (quoting *Autery v. United States*, 992 F.2d 1523, 1529 (11th Cir. 1993)). The Court finds that it does. The Eleventh Circuit said that if extrinsic evidence "shows that the parties agreed that the term 'non-rocky, sandy material similar to that of the existing beach' means that the fill material was to be [for example] no more than 5% rock by volume with no individual rocks larger than 4 inches in diameter, then the standard is sufficiently specific to establish a mandatory duty." *Downs*, 333 F. App'x at 413 n.6. The Court's present construction is similar to the Eleventh Circuit's example. Although the Court's construction might provide the Corps with a certain degree of flexibility in determining the maximum percentage and size of gravel, any rocks greater than one or two inches in diameter would certainly fall outside the scope of the local cooperation agreement. Accordingly, the Court finds that the term "non-rocky, sandy material similar to that of the existing beach" prescribes a "fixed or readily ascertainable standard." The Corps had "no rightful option but to adhere to [that] directive."[7] *Berkovitz v. United States*, 486 U.S. 531, 536 (1988). To the extent that the fill material did not comply with this standard, including rocks as large as coconuts, baseballs, or basketballs that were included in

---

[7] Because the Court finds that the local cooperation agreement provides a "fixed or readily ascertainable standard," the Court need not reach the second prong of the discretionary function exception test—i.e., whether a judgment was grounded in considerations of public policy.

the beach fill, as Downs contends, the government's conduct is not protected by the discretionary function exception, and the government is not immune from suit.

## III. Conclusion

Accordingly, the Court finds that the term "non-rocky, sandy material similar to that of the existing beach" prescribes a "fixed or readily ascertainable standard," and that the government is not immune from suit under the discretionary function exception to the Federal Tort Claims Act. The government's motion for summary judgment (Doc. #22) is denied as to the issue of immunity under the discretionary function exception.

DONE and ORDERED in Chambers, Miami, Florida, August 16, 2010.

Paul C. Huck
United States District Judge

Copies furnished to:
All Counsel of Record