UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 06-20861-CIV-HUCK/BANDSTRA

DWIGHT JOHANNES DOWNS,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter is before the Court for ruling following the bench trial held May 9, 10 and 11, 2011. At this trial, the Court heard evidence on the United States of America's liability to Plaintiff under the Federal Tort Claims Act ("FTCA").[1] Plaintiff contends that the government[2] negligently included large rocks in the beach fill for a Miami Beach renourishment project and that he was injured and paralyzed when he dove into the water and hit his head on one of these large rocks. At issue is whether the government breached its duty to plaintiff in connection with this project, whether the government's negligence was a proximate cause of plaintiff's injury and, in the event the government is found liable, how its liability should be apportioned among Plaintiff and the other entities involved in the renourishment project. For the reasons set forth below, the Court finds as follows.

### I. Background and Procedural History[3]

Plaintiff Dwight Johannes Downs fourth cervical vertebra burst, rendering him a quadriplegic, on Miami Beach in the early morning hours of April 8, 2003. The accident

---

[1] The parties agreed to bifurcate liability and damages, and at this trial the Court did not hear evidence on the issue of damages.

[2] The Court uses the term "government" to refer to defendant United States of America and not the other governments involved in the renourishment project who are not parties to this action.

[3] The Eleventh Circuit's and this Court's prior opinions in this case provide further background. *See Downs v. U.S. Army Corps of Eng'rs*, 333 F. App'x 403 (11th Cir. 2009); *Downs v. United States*, No. 06-20861, 2007 WL 842136 (S.D. Fla. Mar. 20, 2007); *Downs v. United States*, No. 06-20861, 2010 WL 3222140 (S.D. Fla. Aug. 16, 2010); *Downs v. United States*, No. 06-20861, 2011 WL 688739 (S.D. Fla. Feb. 18, 2011); *Downs v. United States*, No. 06-20861, Docket No. 208 (S.D. Fla. Feb. 28, 2011).

occurred on the stretch of beach between 72nd and 73rd Streets.  This portion of Miami Beach has been part of a large beach renourishment project called the Dade County Beach Erosion Control and Hurricane Protection Project ("the Project").  The Project involves dredging fill material from offshore and adding it to approximately 10.5 miles of Miami Beach in the process of erosion.

In 1968, Congress authorized the Project for a period of fifty years substantially in accordance with the design recommendations of the United States Army Corps of Engineers ("the Corps").[4]  In 1972, the United States and Miami Dade County entered into a Local Cooperation Agreement ("LCA") for the Project that sets forth their respective responsibilities on the Project.  Importantly, the LCA states that the "parties mutually agree that only suitable material will be used for project beach fill, such suitable material being defined as non-rocky, sandy material similar to that of the existing beach."

Initial construction on the Project occurred in five phases over the course of the late 1970s and early 1980s, and the Corps awarded dredge and fill contracts for each phase to private contractors.  The area between 72nd and 73rd Streets was included as part of the Project's Phase 2, or Contract 2.  The Corps awarded Contract 2 to Construction Aggregates Corporation ("CAC") in 1978.  Under Contract 2 and its modifications, it was expected that approximately five percent of rock by volume ranging in size from two to ten inches in diameter would be interspersed in the top twelve inches of the fill material deposited on the beach.  The contract modifications required CAC to remove all rocks larger than two inches in diameter to a depth of 12 inches below the finished surface.  CAC was to design the method of rock removal, and the Corps eventually permitted CAC to bury the rock below a depth of 12 inches instead of removing it to off-site areas as originally contemplated.  CAC completed Phase 2 in 1980.  Initial construction on all five phases of the Project ended in 1982.  However, throughout the 1980s, 1990s, and 2000s, the Corps and Miami-Dade County have participated in numerous maintenance efforts on the Project across the length of the covered shoreline.

---

[4] In 1986, Congress supplemented the Project to include construction along a 2.4 mile stretch north of the original Project and to extend federal cost-sharing from ten years to the full fifty-year life of the Project.

Downs brought this suit against the United States for negligence under the Federal Tort Claims Act in 2006.[5] Downs alleges that the Corps negligently designed and constructed the Project by allowing rocks as large as basketballs to be included in the fill material used to renourish the beach. He also alleges that the Corps negligently maintained the Project by failing to ensure that rocks from the fill material would not become exposed in the beach's surf zone as erosion occurred.[6] Downs alleges that the Corps' negligence was the proximate cause of his injuries because he broke his neck by hitting a large rock that was in the beach surf zone due to the Project.

In 2007, the Court granted the government summary judgment holding, in relevant part, that the discretionary function exception to the FTCA excluded Downs' claims. The Court found that the language of the LCA regarding "non-rocky, sandy material similar to that of the existing beach," was ambiguous and not a fixed or readily ascertainable standard, and, therefore, that the government was immune from suit under the discretionary function exception. On appeal, the Eleventh Circuit also found the contract language ambiguous but concluded that extrinsic evidence should be used to construe this LCA term and determine whether it was sufficiently specific to subject the government to suit. On remand, the Court held an evidentiary hearing on the meaning of "non-rocky, sandy material similar to that of the existing beach" following which it concluded that the term means "a material consisting almost exclusively of sand, with only a small percentage of interspersed gravel no larger than one or two inches in diameter." *Downs v. United States*, 2010 WL 3222140, at *2 (S.D. Fla. Aug. 16, 2010). This construction of the contract term was sufficiently mandatory and, hence, the government was found not immune from suit.

On November 22, 2010, the government again moved for summary judgment and, alternatively, for judgment on the pleadings arguing that the Florida statute of repose for actions founded on the design, planning or construction of an improvement to real property, Fla. Stat. § 95.11(3)(c), bars Downs' cause of action and, alternatively, that the government does not owe

---

[5] Previously, Downs brought a similar negligence action in state court against multiple government and private entities. That action was dismissed on various legal grounds.
[6] In February 2011, Downs withdrew his claim of negligence based on a duty to warn beach users about the rocks.

Downs the alleged duty to maintain or warn.[7] On February 7, 2011, the Court held a partial trial limited to the statute of repose issue. After considering the testimony and evidence submitted at that partial trial, the Court found that, assuming the statute of repose applies, it does not bar Downs' action since the LCA was not completed or terminated fifteen years before Downs filed suit. *See* Fla. Stat. § 95.11(3)(c) ("In any event, the action must be commenced within 15 years after . . . the date of completion or termination of the contract between the professional engineer, registered architect, or licensed contractor and his or her employer.")[8] In a separate order, the Court rejected the government's alternative argument that it does not owe Downs the alleged duty to maintain or warn because it does not own the premises upon which his accident occurred. The Court found that under Florida law control, not ownership, of the premises determines liability and that so long as construction on a premises is unfinished, contractors are subject to the same liability as the possessor of the land for harm resulting from their work. *See Downs v. United States,* Docket No. 208, at 2 (S.D. Fla. Feb. 28, 2011). Accordingly, the Court denied the government's motion in its entirety. The Court notes that its two February 2011 rulings in this case as well as all of its previous orders are hereby incorporated by reference in this opinion.[9]

At the trial on liability held May 9, 10, and 11, 2011, the parties submitted documentary evidence and called witnesses to testify. Plaintiff Downs, Rich Bragassa, a private investigator, and Dr. Randy Parkinson, a marine geologist, testified in person for Plaintiff. Plaintiff also presented by deposition video or transcript the testimony of Al Josephson, CAC superintendent for Project 2, Douglas Rosen, a supervisory geologist with the Corps, Dr. Richard Stalnaker, biomechanical expert, and Darrell Drapeau, Downs' friend who was on the beach at the time of the accident. Testifying in person for the government were Thomas Martin, an engineer with the Corps, Brian Flynn, the Miami Dade County Department of Environmental Resources Management's chief individual on the Project, Dr. Bernard Steele, from the Toxicology Section at Jackson Memorial Hospital, Dr. Stefan Rose, physician and forensic toxicologist, and Dr. James Funk, biomechanical expert. The government also presented the deposition testimony of René Brisson, a Canadian tourist on the beach at the time of the accident, Shalahn Griffin,

---

[7] As indicated at footnote 6 *supra*, Downs has withdrawn his claim of negligence based on breach of a duty to warn.

[8] In 2006, the Florida Legislature shortened the repose period from fifteen to ten years; however, the parties agreed that the older version of the statute is the relevant version.

[9] *See* footnote 3 *supra* for a list of the significant previous opinions in this case.

4

Downs' former girlfriend, Dr. Edward Benzel, neurosurgeon, Aaron Hendry, Plaintiff's expert on dredging, and Robert Brantley and Scott Woolam, both of the Florida Department of Environmental Protection.

## II. Analysis

### A. Findings of Fact

#### 1. Plaintiff's Accident and the Nature and Mechanism of His Injuries

Considering the evidence and testimony summarized below, the Court finds that Downs dove at a deep diagonal angle into the ocean and hit his head on a rock that was part of the Project fill material, thereby causing his injuries.

Between 6:00 and 8:00 p.m. on April 7, 2003, Dwight Downs, then 25 years old, went to the house of his close friend, Darrell Drapeau. Downs stayed up the entire night with Drapeau watching a basketball game, playing chess and drinking approximately ten to twelve beers and a Hennessy cognac. At about 5:00 to 6:00 a.m. the next morning, the two men went to the beach to watch the sunrise. They went to the area of Miami Beach between 72nd and 73rd Streets. At the beach, Downs consumed approximately two to three more beers. Downs testified that he ran into the ocean and dove in head first. He testified that he dove with his arms in front of his body and that he dove out, not down. He also testified that the water was at approximately his knees when he dove. His next memory after the dive is waking up in the hospital.

Drapeau did not see Downs dive into the water. A passerby, René Brisson, a Canadian tourist to Miami Beach, was the first to notice Downs after the accident. Brisson testified that he and his wife arrived at the beach at approximately 7:00 a.m. on April 8, 2003. Brisson saw Downs and Drapeau on the beach "having fun," which he explained as running, jumping and flipping into the water, and pushing each other. Brisson also did not see Downs enter the water. Brisson testified that when he first saw Downs floating in the water, he yelled to Drapeau, who at that point was sitting on the sand, facing the ocean but with his head thrown back. Drapeau, assisted by Brisson, carried Downs out of the water. Drapeau testified that Downs' head was "gashed," his blood "everywhere," and that there was sand in the laceration on his head.

Downs' medical records from Jackson Memorial Hospital establish that he suffered a C-4 burst fracture. Dr. Benzel, the government's expert in neurosurgery, testified that a C-4 burst

5

fracture is a splintering and compression of the fourth cervical vertebra into the spinal cord generally caused by an axial blow—that is, a blow to the top of the head that carries the load straight down the spinal column. Dr. Benzel also testified that Downs' CAT scan showed a hematoma on the right side of his head behind the midline, which implies a significant blow to that region. Downs' medical records also show that Downs had a seven centimeter jagged, deep laceration to the top of his scalp, and Downs testified that the laceration required nine staples. Photographs show the extensive scar that remains on Downs' scalp from that wound. Downs only other injuries were abrasions to his arms. In Downs' pre-operative assessment, a nurse notes multiple bilateral arm lesions; in the initial resuscitation assessment, the nurse notes abrasions to his left wrist; and Downs testified that he had scrapes to his inner forearms. Injuries to Downs' face or hands were not recorded.

The Court heard the testimony of Dr. James Funk, the government's expert in biomechanical engineering, and read the testimony of Dr. Richard Stalnaker, Downs' biomechanical expert. These experts agreed as to the general mechanism of Downs' C-4 burst fracture. They both testified that in order to suffer such a compression injury, Downs' head, neck, and spine had to be in straight alignment. A burst fracture occurs, these experts agreed, when a very substantial blow to the head creates a load that then transfers straight down the spine until it bursts a vertebra. In Downs' case, Dr. Benzel testified, based on his review of Downs' CAT scan and X-rays, the blow occurred a bit behind the top of his head with Downs' spine in a slight forward-bending posture. Both Drs. Funk and Stalnaker agreed that in order for the burst fracture to have occurred, Downs must have rotated his head slightly forward to remove the natural backward curve of the neck.

Dr. Funk testified that a generally horizontal dive, as described by Downs, into a rock of the approximate weight of the rocks retrieved from the beach where his accident occurred could not have caused Downs' burst fracture. Dr. Funk based this testimony on a mathematical model derived from the law of conservation of momentum. This model indicated that if Downs made a generally flat dive as Downs described (1) Downs could not have been running at the speed required to break his neck on a rock of the weight of the rocks found on the relevant beach and (2) assuming that Downs was running at a realistic speed, no rock of sufficient weight and dimension to break his neck was found on the relevant beach. Dr. Funk further opined, within a reasonable degree of scientific certainty, that Downs' injury occurred at a more vertical angle

6

than the angle described by Downs because at such a more vertical angle gravity provides additional force and momentum creating the necessary load to burst a vertebra. However, he also testified there is no way to differentiate, from a biomechanical perspective, whether Downs at a vertical orientation hit his head on a rock or the ocean floor. Dr. Stalnaker testified that based on the process of elimination the rocks found on the relevant beach were sufficient to cause Downs' burst fracture, although he did not provide a biomechanically-supported model or other detailed basis for his opinion.

Based on the foregoing, the Court finds that it is more likely than not that (1) Downs dove into the ocean (2) at a deep diagonal angle, (3) hit his head on a large rock, and (4) the impact from the rock and the Earth underneath it created a significant load that was transferred to his C-4 vertebra causing it to burst.

First, the Court finds that Downs dove into the ocean. Downs testimony of his dive provides direct evidence on this point. In light of Downs' testimony and the severity of his injuries, namely a C-4 burst fracture and a seven centimeter gash to his head, the Court finds that the most reasonable conclusion to be drawn from the evidence is that his accident occurred by means of his dive. The Court notes that the government did not argue that anything other than a dive caused Downs' paralysis and head injury.

Second, the Court finds that Downs took a deep diagonal[10] dive into the ocean. Given the lack of eyewitnesses to Downs accident, the testimony of the reconstruction experts is particularly important to the Court's analysis. The Court finds persuasive Dr. Funk's biomechanical opinion, based on mathematical modeling, that Downs' compression injury was not caused by diving in a roughly horizontal manner into a rock, even one embedded in the ocean floor. The Court also concludes that Downs' C-4 burst fracture was not caused by diving in a roughly horizontal manner into a non-rocky ocean floor. In that case, one would predict lacerations or abrasions to Downs' face or forehead and a flexion-type spinal injury. Moreover, it is difficult, if not impossible, for a dive at such an angle without any obstruction on the ocean floor to cause a blow to the top rear of an individual's head. Therefore, the Court concludes that

---

[10] *See* American Heritage College Dictionary at 383 (3d. ed. 1997) (defining diagonal as, *inter alia*, "having a slanted or oblique direction."). Based on the credible expert testimony, the Court concludes that Downs did not dive at a horizontal angle; however, it cannot state for certain the angle of Downs' dive.

Downs dove into the ocean at a deep diagonal orientation. At such an orientation, as Dr. Funk testified, Downs could have suffered the burst fracture that he did because gravity and "the greatest rock of all," the Earth, provide additional "force and momentum." The Court acknowledges that Downs testified that he dove "out, not down." The Court rejects this testimony because it is inconsistent with the more persuasive biomechanical and medical evidence. Moreover, in his closing argument, Plaintiff's counsel acknowledged that Plaintiff's dive could not have been a flat horizontal dive.

Third, the Court finds that the totality of Downs' physical injuries lead to the reasonable inference that he more likely than not hit his head on a large rock when diving at a deep diagonal angle. Downs had a deep, jagged seven centimeter laceration to the top of his head. This laceration strongly suggests contact upon impact with a hard rock, not the sandy or even shell-filled ocean bottom. While Drapeau testified that he saw sand in Downs' head laceration, the presence of sand in the wound is not inconsistent with hitting a rock. Sand could have entered the wound right after impact with the rock before Downs' body floated to the surface or while Downs was on the beach prior to the arrival of medical personnel. Downs' medical records also indicate that he had abrasions to one or both arms. At a deep diagonal angle, Downs, diving head first with his arms in front of him, as he testified, could have scraped his forearms and/or wrist on the rock before his head made contact with the rock.

Fourth, based on Dr. Funk's persuasive testimony, the Court finds that Downs' impact with this large rock, supported by the Earth, created a significant load that was transferred to his C-4 vertebra causing it to burst.

2. The Project's Placement of Rocks in the Surf Zone Where Downs' Accident Occurred

Downs' accident occurred between 72nd and 73rd Streets on Miami Beach, a stretch of beach renourished during Phase 2 or Contract 2 of the Project. At trial, the Court heard and received extensive evidence regarding the existence of rocks as large as coconuts, baseballs or basketballs in the surf zone of the beach covered by Phase 2 and, more specifically, in the surf zone of the beach between 72nd and 73rd Streets. This evidence, summarized below, also shows that these large rocks were placed along the shoreline by Project construction.

Al Josephson, project superintendent for CAC, the subcontractor on Phase 2, testified that the borrow area—that is, the offshore source of the fill—for Phase 2 contained coral rocks up to football size and that these rocks were included in the fill material placed on the beach. The Corps, Josephson testified, chose the borrow area. While he could not recall the exact place or time, Josephson testified that he recalled seeing, at least occasionally, rocks twelve inches or larger in diameter coming out of the dredging pipeline onto the beach. Dr. Randy Parkinson, marine geologist, confirmed that the borrow area for Phase 2 contains coral pieces. Parkinson explained that borrow areas for the Project were basins in offshore reef tracks consisting of limestone and coral species. Josephson also explained how such large rocks arrived on the beach during Phase 2 construction. For Phase 2, CAC used a cutterhead dredge, which grinds up sand or loosens up rock encountered in the borrow area and then pumps the material through a pipeline to the shore. Josephson testified that a ring was placed at the back of the cutter's suction pipe, thereby impeding the passage of rocks larger, but not smaller, than fifteen inches in diameter through the pipeline. Josephson also testified regarding the existence of another type of dredge, a hopper dredge, which contains screening processes to remove most rocks larger than approximately four inches in diameter. In the specifications for Contract 2, the Corps gave CAC the option of using either a cutterhead or hopper dredge. A hopper dredge, Josephson testified, was used on Phase 4 and Phase 5 of the Project, and Douglas Rosen, Corps geologist, testified that the contracts for Phases 3, 4, and 5 of the Project contained provisions for rock removal because the history of the Project showed that rocks were an issue.

As explained in the background section of this opinion, modifications to the contract for Phase 2 required CAC to remove all rocks larger than two inches in diameter from the top twelve inches of the fill placed on the Phase 2 beach. The Corps permitted CAC to bury these two-inch and larger rocks to a depth of twelve inches and below the surface, instead of removing them from the beach fill entirely. Moreover, under modifications to the contract for Phase 3 of the Project, the subcontractor on that phase performed further removal of rocks in the surf zone of the beach under Phases 1, 2 and 3. Josephson testified that nothing was done regarding rocks in the fill material below a depth of twelve inches on the Phase 2 beach.[11]

---

[11] Josephson's testimony was actually that nothing was done with rocks in the fill below a depth of two feet, or twenty-four inches. However, at trial it was established that the Corps and the CAC eventually agreed that the depth cut-off was twelve, not twenty-four, inches.

9

Douglas Rosen, Corps geologist, testified that as the beach continues eroding, rocks in the fill material below 12 inches become exposed and concentrated in the surf zone where the waves break. A 1984 report issued by the Corps corroborates this conclusion that large rocks in the lower beach fill of the Phase 2 beach would become exposed over time. This report explained:

> During construction of the project, coral fragments in the borrow material were common. . . . Construction specifications for phases one through three required that all material over two inches in diameter be removed from the completed beach fill to a depth of 12 inches. This method of rock removal proved to be totally inadequate. Reworking of the fill material in the surf zone by wave action continually exposes and concentrates the rock. This rock has proved to be very hazardous to beach users.

Dade County Beach Erosion Control and Hurricane Surge Protection Project, Project Design Memorandum, Addendum II at 21 (June 1984). This report also indicated that in order to bring the Project in compliance with its authorization, rocks must be removed from the majority of the Project shoreline. Attached to the report were memoranda from Dade County surveying the rock problem created by the Project as well as existent rock removal efforts. Dade County continued rock removal ventures along the length of the covered shoreline in the 1980s and 1990s, as explained more fully in Section 3b of these Findings of Fact.

René Brisson and Darrell Drapeau, both on the beach with Downs at the time of his accident, testified regarding their personal knowledge of large rocks in the surf zone between 72nd and 73rd Streets. In 2007 Brisson testified that he and his wife have gone to Miami Beach almost every year for six years and that he has swum in the area where he observed Downs and Drapeau. Brisson testified that the first few feet of the underwater shore in that area is rocky, containing rocks up to basketball-size. He further testified that he has seen such large rocks every year when he has gone in the water in that area. Drapeau testified that he returned to the accident scene at some point in April 2003 and found rocks in the surf zone in the general location where he found Downs' floating body. The largest of these rocks, Drapeau testified, was a cinderblock in size.

The Plaintiff submitted photographs of rocks found in the surf zone between 72nd and 73rd Streets after his accident as well as testimony and evidence linking these rocks to the Project construction. Some of these photographs depict rocks found in this area by Rich Bragassa,

Downs' private investigator, in November 2005. Bragassa testified that he removed rocks he found in the shallow underwater area of Downs' accident, and the photographs of the rocks he retrieved show rocks on the dry beach next to a tape measure. Some of the rocks retrieved by Bragassa are ten to twelve inches at their longest or widest point. The other photographs submitted by Plaintiff depict rocks underwater that appear to be approximately the same size. Dr. Randy Parkinson, marine geologist, testified that the rocks depicted in Plaintiff's photographs and found in the area of his accident are associated with one or more of the offshore borrow sites for the Project. He based this conclusion on the limestone composition of the rocks, which he inspected or simply observed by photograph, as well as the coral species recognizable in many of these rocks. Dr. Parkinson also testified that he snorkeled in surf zone area between 72nd and 73rd Streets in November 2010 and observed boulder-sized rocks at waist depth that he believed, based on their composition, were dredged as part of the Project. Photographs of the rocks that Dr. Parkinson found were also submitted into evidence.

At the May 2011 trial, as well as at evidentiary hearings in the summer of 2010, the Court heard extensive evidence establishing that large rocks do not exist naturally on the relevant area of Miami Beach. Dr. Parkinson testified that it was his definitive conclusion that boulder size rocks—which he defined as ten-inches and greater in diameter—found on the beach area of Downs' accident came from Project borrow areas and could not have arrived on the beach by means of natural processes. Moreover, Parkinson testified, rocks of the size, number and type of the rocks observed on the renourished Miami Beach are not observed on segments of the coast that have not been renourished. Also, as summarized in this Court's August 2010 opinion, samples of the beach gathered by the Corps prior to Project renourishment show that the native beach was predominantly sand with seven percent or less gravel "with a maximum size of approximately three-quarters of an inch." *Downs v. United States*, 2010 WL 3222140, at * 3 (S.D. Fla. Aug. 16, 2010). The sandy composition of the native beach was corroborated by lay witnesses who frequented Miami Beach prior to the Project and testified that they either did not recall seeing rocks on the beach or recalled seeing only an occasional small rock. *See id.* at * 4.

Based on the foregoing testimony and evidence, the Court finds that the beach surf zone where Downs' accident occurred contained rocks as large as coconuts, baseballs or basketballs and that these large rocks were placed on the beach by the Project and became exposed in the surf zone by the process of erosion. Because the Court concludes that the large rocks in the surf

zone between 72nd and 73rd Streets came from Project dredging operations, the Court further finds that the rock Downs struck when diving in this area was a rock placed on the beach during the Project. This is the most reasonable inference to be drawn from the evidence. The Court acknowledges that the composition of the beach surf zone in this area, as in any beach area, is constantly changing due to wave, storm, erosional and other activity. However, no matter these changes, the fact remains that large rocks were placed in the deep beach fill during Phase 2 construction and these non-indigenous rocks have been observed in the surf zone up to the present day. Moreover, the Court notes that Downs suffered a seven centimeter—that is, an almost three inch—wound to his head. Only a large, not a small, gravel-sized, rock could cause such a wound.

### 3. Apportionment of Responsibility

#### a) Plaintiff's Fault for His Injuries

Downs' medical records establish that at 8:26 a.m. on April 8, 2003, his serum ethanol level was 201 milligrams per deciliter. Serum ethanol levels report the level of ethanol in a patient's clotted blood. This level can then be converted to an equivalent whole blood alcohol level by using a numerical conversion factor. Dr. Steele testified that there is no single, accepted conversion factor. Dr. Rose, the government's forensic toxicologist, testified that a 201 serum ethanol result converts to a blood alcohol level of 0.16 percent, whereas Dr. Steele testified that it converts to a blood alcohol level of 0.17 percent. Dr. Rose also testified that Downs' blood alcohol level was lower, approximately 0.13 percent, at the time of the accident.[12]

The Court acknowledges that certain factors can affect reported blood alcohol levels. However, the Court does not believe that these factors were materially significant in Downs' case. Moreover, the testimony of Downs and Drapeau establishes that Downs drank very significant amounts of alcohol during the approximately twelve hours prior to his accident. This is not disputed. Downs and Drapeau testified that Downs drank approximately ten to twelve beers at Drapeau's house, and Drapeau testified that they each also drank a Hennessy cognac at his house. They also testified that the only food they consumed during that same period was a pizza. Shalahn Griffin, Downs' girlfriend at the time of the accident, testified that Downs called

---

[12] The Court notes that Downs' blood alcohol level was significantly over the legal driving limit of 0.08 grams of alcohol per 100 milliliters of blood. *See* Fla. Stat. § 316.193.

her at around 4:00 a.m. on April 8, 2003, on his way to the beach, and that his language was slurred during the telephone call. At the beach, Drapeau testified that Downs drank approximately two to three more beers. Brisson testified that he saw a lot of beer bottles around a cooler next to Downs and Drapeau on the beach and that the men were "staggering around" close to the cooler.

At the time of the accident, Downs lived in North Bay Village, Miami Beach, which is close to the 72nd to 73rd Street beach. Downs testified that he went to Miami Beach between 72nd and 73rd Streets from time to time, and Drapeau testified that he and Downs went a couple of times to that same beach and that Downs went swimming. Even though there was no signage regarding the presence of rocks or the dangers of diving, Drapeau testified that he saw Downs dive into the ocean in the 72nd to 73rd Street area prior to April 2003. Moreover, as explained earlier, Brisson testified that he has seen large rocks in the surf zone in the 72nd to 73rd Street beach area every year when he has gone into the water there.

Finally, the Court notes that the 911 call reporting Downs' accident was placed at 6:58 a.m., April 8, 2003. Sunrise that day occurred at approximately 7:05 a.m.[13]

Based on the foregoing evidence, the Court finds that Downs was negligent and his negligence contributed to his injuries.

### b) Division of Responsibility Among Other Entities

Throughout the course of this litigation, the Court has heard and received evidence regarding the numerous governmental and private actors involved in the Project.

As indicated in the Background section of this opinion as well as the Court's previous opinions in this case, the Corps designed and constructed the Project. The Corps subcontracted out the five phases of initial construction and also subcontracted rock removal work for the Phase 2 beach to CAC and Great Lakes Dredge and Dock Co., the subcontractor for Phase 3. The Corps also engaged in significant maintenance of the Project in the 1980s, 1990s and 2000s after the conclusion of initial construction. In a prior opinion the Court detailed the Corps

---

[13] Sunrise and sunset in Miami, April 2003, Timeanddate.com, http://www.timeanddate.com/worldclock/astronomy.html?n=156&month=4&year=2003&obj=sun&afl=-11&day=1. The Court takes judicial notice of this fact since neither party submitted evidence on this issue.

maintenance work on the Project, indicating that the Corps monitors the erosion levels of the covered beach and engages in periodic renourishment efforts to place additional fill material on eroding portions of the Project beach. *See Downs v. United States,* 2011 WL 688739, at *5–6 (S.D. Fla. Feb. 18, 2011). Thomas Martin, the Corps lead engineer on the Project, testified in February that the Corps renourished areas covered by Phase 2 in 1987 and 2001 and that the Corps has another renourishment project for Phase 2 areas tentatively proposed for the summer of 2011. Previously in this opinion, the Court discussed the Corps' involvement in the placement of rocks on the beach and its awareness of the hazard that such rocks posed. Despite its intimate involvement in initial construction and maintenance of the Project and its continued awareness regarding the rock problem, the Corps did not sufficiently remove the rocks or otherwise reduce the danger posed by the rocks. Based on the foregoing evidence, the Court finds that the Corps was negligent and its negligence contributed to Downs' injuries.

Miami-Dade County is the local sponsor for the Project and signatory of the Local Cooperation Agreement ("LCA"). As such, it participated in the beach renourishment project in conjunction with the Corps. During the May 2011 and the February 7, 2011 trials, Brian Flynn from the County's Department of Environmental Resources Management testified at length regarding the County's involvement in the Project. As the Local Sponsor, the County organizes non-federal funding sources and secures easements. Until the easements are in place, Flynn testified, the Corps cannot proceed. Flynn testified that since the start of his employment with the County in 1985, the County has performed, without financial assistance from the Corps, approximately sixteen truck-hauls that have placed sand along problem erosion areas of the Project. Flynn also testified regarding other County maintenance efforts on the Project, which include removing rock and trash debris from the beach. The County, without any federal participation, removed rocks along the Project beach up through the mid-1990s. The evidence received at trial establishes that the County was aware of the rock problem created by the Project during initial construction and as early as 1984 engaged in efforts to remove and/or reduce the quantity of these rocks. The Court finds that the County, who has a more significant on-site presence on Miami Beach than the Corps, failed to eliminate the danger posed by the rocks and failed to warn beach users regarding rocks on the beach. Based on the foregoing evidence, the Court finds that Miami-Dade County was negligent and its negligence contributed to Downs' injuries.

The State of Florida, through a Board of Trustees, owns and ultimately controls the beach and swimming area (submerged lands three miles east of coastal construction) of Miami Beach. Robert Brantly, Jr., engineer with the Florida Department of Environmental Protection, formerly the Florida Department of Natural Resources, testified that his Department's role in the initial construction of the Project was two-fold: (1) to share the non-federal cost of the Project with the local government and (2) to issue a coastal construction permit. Additional permits were issued for subsequent maintenance renourishments of the Project beach, Brantly testified. The original permit for the Project, issued in August 1976, does not mention rocks, although a notice for a permit for a periodic renourishment indicates that the Department of Environmental Protection found certain specifications regarding maximum rock size to be "particularly important." Brantly also testified that at the time the original permit for the Project was issued, the State was aware that there was a potential that rocks would be included in the fill used for renourishment. The Court finds that the State had knowledge regarding the presence of rocks on the beach yet failed to require their removal and warn about their presence. The Court notes that the State's duty to remove and/or warn regarding the rocks on Miami Beach falls within its non-delegable duty as landowner. *See U.S. Security Services Corp. v. Ramada Inn, Inc.*, 665 So. 2d 268, 270-71 (Fla. 3d DCA 1996) (discussing a landowner's non-delegable duty to invitees to maintain its premises in a reasonably safe condition). Based on the foregoing evidence, the Court finds that the State of Florida was negligent and its negligence contributed to Downs' injuries.

The City of Miami Beach in February 1992 entered into a Management Agreement with the State of Florida Board of Trustees of the Internal Improvement Trust Fund pursuant to which the State grants the City management responsibilities for the subject beach for a period of twenty-five years. Scott Woolam, also of the State of Florida's Department of Environmental Protection, testified that under this Agreement, the City is delegated the authority to be stewards of the beach, which includes both dry land and submerged lands where boating, bathing and surfing occur. Specifically, under the Agreement, the City agrees to manage the "limitation and control of land and water related activities such as boating, bathing, surfing. . . ." Prior to February 1992, these management responsibilities belonged to the State of Florida. Under the Management Agreement, the State retains the right to "enter the property and engage in management activities not inconsistent with the management plan" as well as the right to inspect the City's operations under the Agreement. The Court finds that the City of Miami Beach failed

to properly manage the beach because it allowed the rocks to remain in the surf zone and did not warn regarding their dangers. Based on the foregoing evidence, the Court finds that the City of Miami Beach was negligent and its negligence contributed to Downs' injuries.

### B. Conclusions of Law

A plaintiff must show the following three elements to prove negligence under Florida law: (1) The defendant has a duty to conform to a certain standard of conduct for the protection of others including the plaintiff; (2) defendant failed to perform that duty; (3) defendant's breach of the duty proximately caused plaintiff's injury. *Stahl v. Metro Dade County*, 438 So. 2d 14, 17 (Fla. 3d DCA 1983). Based on the preceding factual findings, the Court concludes that Downs has satisfied these elements and has established the government's negligence under Florida law.

The Court finds that the government, through the Corps, owed Downs a duty to not include large rocks in the fill material used to renourish the beach and a duty to not allow such rocks to become exposed in the surf zone where they posed a danger to beach users. The Court rejects the government's argument that Downs' allegations regarding its duty, at least those relating to Project construction, deprive the Court of subject matter jurisdiction under the Tucker Act. The Court finds that the LCA contract is not the source of the government's duty to Downs. The LCA expresses, at least in part, the Corps' undertaking for the Project. After entering this undertaking, the Corps became obligated to complete the Project in a reasonably safe manner.[14] The Court has also previously rejected, as summarized *supra* page 4, the government's argument that it does not owe Downs a duty to maintain the relevant beach because it does not own this land.

The Court concludes that the government breached its duty to Downs because the Corps allowed rocks, up to a basketball in size, to be placed in the beach fill on Phase 2 and knowingly allowed at least some of these rocks to become exposed in the surf zone between 72nd and 73rd Streets. The Court also finds that the government's breach of its duty was a proximate cause of the injuries that Downs sustained when he dove diagonally into the ocean and hit his head on a

---

[14] The cases cited by the government in support of its argument that the Tucker Act deprives this Court of jurisdiction are distinguishable because they involve tort claims that are based entirely on the government's breach of a contract. *See Woodbury v. United States*, 313 F.2d 291, 295 (9th Cir. 1963); *Davis v. United States*, 961 F.2d 53, 56 (5th Cir. 1991); *Union Pacific v. United States*, 591 F.3d 1311, 1315-16 (10th Cir. 2010).

rock.  The injuries sustained by Downs were a foreseeable result of the government's negligence. *See Crislip v. Holland*, 401 So. 2d 1115, 1117 (Fla. 4th DCA 1981) ("In order for injuries to be a foreseeable consequence of a negligent act, it is not necessary that the initial tortfeasor be able to foresee the exact nature and extent of the injuries or the precise manner in which the injuries occur. [A]ll that is necessary . . . is that the tortfeasor be able to foresee that some injury will likely result in some manner as a consequence of his negligent acts.")  The Court also concludes, as discussed above, that Downs', Miami-Dade County's, the State of Florida's, and the City of Miami Beach's negligence each contributed to Downs accident and resulting injuries.

In accordance with applicable Florida law and based on the evidence presented here, the Court concludes that the percentage of liability for Downs' damages should be allocated as follows: Downs 50 percent, the Corps 15 percent, Miami-Dade County 15 percent, the State of Florida 10 percent, and the City of Miami Beach 10 percent.

DONE and ORDERED in Chambers, Miami, Florida, June 13, 2011.

_____

Paul C. Huck
United States District Judge

<u>Copies furnished to</u>:
Counsel of Record